THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID L. COLEMAN,                    :
                                     : CIVIL ACTION NO. 3:19-CV-749
            Plaintiff,               : (JUDGE MARIANI)
                                     :
      v.                             :
                                     :
FOREMOST INSURANCE COMPANY           :
t/a FOREMOST INSURANCE GROUP,        :
                                     :
            Defendant.               :
                                     :

## MEMORANDUM OPINION

### I. INTRODUCTION

Here the Court considers Defendant's Motion for Summary Judgment (Doc. 39) with which Defendant Foremost Insurance Company ("Defendant") seeks judgment in its favor on the bad faith claim filed pursuant to 42 Pa. C.S. § 8371 contained in Count II of the two-count Complaint Plaintiff David Coleman ("Plaintiff") filed on May 1, 2019 (see Doc. 1-1 at 12, Doc. 40 ¶ 1).[1]  For the reasons discussed below, the Court will grant Defendant's motion.

_____

[1] On June 12, 2020, Plaintiff filed the "Stipulation of Dismissal with Prejudice as to Underinsured Motorist Averments in Count I Only" wherein Plaintiff states that he "stipulates to the dismissal with prejudice of the underinsured motorist claim only, as contained within the averments of Count I of Plaintiff's Complaint.  The remainder of Count 1 and all of Count II are not included within this stipulation of dismissal." (Doc. 31 at 1.)  Plaintiff asserts that Count I contains allegations in support of common law bad faith which is still viable.  (Doc. 49 ¶ 1.)

## II.  STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

Plaintiff alleges that he sustained bodily injuries when he was rear-ended by Sara Katrenicz while he was stopped at a stop sign in Wilkes-Barre Township, Pennsylvania, on May 25, 2016.  (Doc. 40 ¶ 2; Doc. 49 ¶ 2.)  Plaintiff was insured by Defendant at the time. (*Id.* ¶ 1.)  On May 31, 2016, the accident was reported to Defendant.  (*Id.* ¶ 3.)

By letter dated June 1, 2016, the Med/PIP claims representative, Tracy Marshall, acknowledged Plaintiff's First Party Benefits claim for underinsured motorist ("UIM") benefits with Defendant, included an explanation of the medical and work loss benefits payable through the insurance policy, and requested that Plaintiff complete the enclosed Application for Benefits and other documentation.  (*Id.* ¶ 4.)

_____

[2] In the Statement of Undisputed Material Facts, the Court includes those facts which are agreed upon. With limited exceptions, the Court does not include the parties' citations to the record in this recitation.

In answer to many of Defendants statements of fact, Plaintiff responds "[d]enied as stated." (*See* Doc. 49.)  Where Plaintiff responds "[d]enied as stated," the Court deems Defendant's statement admitted to the extent it is consistent with the evidence cited by Defendant in support of its assertion and is not substantively refuted by Plaintiff. In some instances, the Court directly cites the record as a means to focus on the parties' agreement on the matter raised in the statement of fact at issue.  In other instances, to provide context and clarity, the Court provides undisputed record evidence pertinent to a proffered statement of fact.

The Court is not required to consider statements of fact proffered by Plaintiff (*see* Doc. 49 ¶¶ 199-202) in that separate statements of fact not directly responsive to the movant's statement of facts are not contemplated by L.R. 56.1 of the Local Rules of Court of the Middle District of Pennsylvania and need not be given any evidentiary value.  *See, e.g.*, *Rau v. Allstate*, Civ. A. No. 3:16-CV-359, 2018 WL 6422121, at *2 (M.D. Pa. Dec. 6, 2018), *aff'd*, 793 F. App'x 84 (3d Cir. 2019).  However, here the Court considers Plaintiff's separate factual assertions because they contain relevant factual assertions to which Defendant has responded (*see* Doc. 51-1).

A June 1, 2016, Claim File note indicates that Defendant's initial claim review uncovered numerous claims and prior accidents before the May 25, 2016, accident, at least seven accidents since 2011, and the ISO Report indicated at least fourteen accidents of various kinds between August 18, 2004, and May 25, 2016. (*Id.* ¶ 5.[3]) In a June 14, 2016, Claims file note, claims representative ("CR") Kenneth Smith stated "'[w]hen asked if he had any prior medical conditions or injuries, [Plaintiff] abruptly stopped the conversation stating he would have to go see the [doctor] first then he hung up. He did not answer upon recall.'" (*Id.* ¶ 7 (quoting Ex. B, claim file note dated 6/14/15 on p.20).[4])

By letter dated June 28, 2016, CR Kenneth Smith informed Plaintiff's counsel that Foremost is investigating Plaintiff's claim and that additional time is needed to complete the investigation. (*Id.* ¶ 9.)

By letter dated July 5, 2016, CR Kenneth Smith informed Plaintiff that Geico, the insurer for vehicle that Katrenicz was driving, confirmed it had sufficient coverage for Plaintiff's injuries and, therefore, an injury claim through his UIM coverage is not applicable.

---

[3] As with many of his responses, Plaintiff indicates that Defendant's averment is "Denied as stated." (*See* Doc. 49 ¶ 5.) Plaintiff states that he "takes issue with the accuracy of the ISO reports" upon which Defendant relies but he admits that Defendant "had access to the report, with whatever inaccuracies they may contain." (*Id.*) Plaintiff's response indicates he does not take issue with the basic information contained in Defendant's statement but rather with the reliability of the source. Plaintiff does not cite any contradictory evidence. Plaintiff's opposition brief states that, in addition to the May 25, 2016, accident, "Mr. Coleman also had multiple prior and a single subsequent motor vehicle accident. SMF 5." (Doc. 48 at 2.) Because Plaintiff cites Defendant's paragraph 5 in connection with the averment concerning his accident history, the Court deems his response to be an admission.

[4] Though Plaintiff denies this paragraph "as stated," he does not dispute the accuracy of the quoted material. (Doc. 49 ¶ 7.)

(*Id.* ¶ 13 (citing Ex. C, p. 26).)   The letter also advises Plaintiff to contact Defendant "if there is any additional information which would affect your coverage."  (Ex. C. p. 26.)

Med/PIP CR Marshall continued activity on medical/PIP aspects of Plaintiff's claim, including seeking and receiving confirmation of ongoing treatment (*see, e.g*., Doc. 40 ¶¶ 20, 23; Doc. 49 ¶¶ 20, 23) and her intent to seek peer review regarding Plaintiff's chiropractic treatment of his neck and low back, dental treatment, and pain management for jaw pian because Plaintiff was still treating a year after  the May 25, 2016, accident (*id.* ¶¶ 26, 27). After obtaining peer review of the medical claims, Defendant stopped payment for medical treatment on July 14, 2017.  (Ex. C, p. 116.)  However, Marshall's October 17, 2017, letter to Plaintiff's counsel informed him that Defendant would continue to reimburse payment for dental treatment based on the results of the dental peer review which had considered the records of Don Malizia, D.D.S., and Anthony Polit, D.M.D.  (*Id.* ¶ 32.)

Throughout November and December 2017 and January through March 2018, there was regular activity on the claim as Marshall evaluated and assessed the claim and followed up with providers for treatment updates and status, including a notes on December 4, 2017, and February 12, 2018, that Plaintiff was still receiving dental treatment for his jaw pain and would continue to do so.  (*Id.* ¶36.)

By letter of April 11, 2018, sent by first class mail and fax, Plaintiff's counsel informed Defendant that Plaintiff was asserting a UIM claim because Geico's insured was "grossly underinsured."  (Ex. C, p. 152 (*see also* Doc. 40 ¶ 39; Doc. 49 ¶ 39).)  On the same date,

the claim was reassigned to CR David Loethen.  (*Id.* ¶ 38; Ex. B, p. 140.)  On April 12, 2018, Loethen acknowledged Plaintiff's counsel's April 11, 2018, correspondence and asked him to send the information promptly.  (Id. ¶ 40.)

By letter dated April 18, 2018, Loethen requested from Plaintiff the "treatment records and bills for medical services Mr. Coleman obtained due to injuries that resulted from the May 25, 2016 accident [and] any out-of-pocket receipts for medical products that Plaintiff purchased related to his injuries."  (*Id.* ¶ 42.)  By letter dated April 26, 2018, Plaintiff's counsel submitted certain medical records in support of Plaintiff's UIM claim, and the transcript of Plaintiff's deposition testimony taken on October 2, 2017, in another lawsuit involving a motor vehicle accident on June 4, 2015 in which Plaintiff sustained significant injuries for which he was still treating.  (*Id.* ¶ 43.)

On May 8, 2018, Loethen called Plaintiff's counsel, was unable to reach him, and left a voice message asking him to return the call to discuss the status of Plaintiff's demand. ((Id. ¶ 44.) Later that day, Plaintiff's counsel left a voice message for Mr. Loethen and advised that Plaintiff was still treating and did not provide a demand. (Id.)

In a status letter dated June 11, 2018, Loethen advised Plaintiff's counsel of the status of the evaluation of Plaintiff's UIM claim and that additional time is needed to evaluate the claim and the reasons. (Id. ¶ 45.)  He stated that Defendant was "'waiting to evaluate [Plaintiff's] medical records as you've indicated your client is still treating.'" (*Id.* (quoting Ex. C. p. 161).)  Loethen requested that Plaintiff's counsel inform Defendant when

all medical treatment are completed, and that Plaintiff's counsel obtain the medical records and bills for the ongoing treatment and provide them to Defendant for review. (*Id.*) Loethen stated that to fully and fairly evaluate Plaintiff's UIM claim, Defendant needed to review these additional medical records and bills. (*Id.*)

On June 15, 2018, Marshall called Plaintiff's counsel to follow up on Plaintiff's medical treatment and Plaintiff's counsel confirmed that Plaintiff was still treating. (*Id.* ¶ 46.)

By letter dated June 27, 2018, addressed to Loethen, Plaintiff's counsel submitted a narrative report dated June 25, 2018, by Don Malizia, D.D.S. at Allentown Pain & Sleep Centers. (*Id.* ¶ 48.) In the June 25, 2018, report, Dr. Malizia described the injuries Plaintiff sustained "as a result of motor vehicle accidents that occurred on 6/4/2015 and 5/25/2016." (*Id.* ¶ 49 (quoting Ex. F at 1.) He states that, after the 2015 accident, the diagnoses made by Barry Glassman, D.M.D., were

> right temporomandibular joint arthralgia, painful peripheral trigeminal neuropathy (PTTN) and nocturnal bruxism. The plan of treatment included intraoral orthotics and supportive therapy to consist of iontophoresis of the left temporomandibular joint stylomandibular ligament and injections of the left sphenopalatine ganglion. Gabapentin was prescribed
>
> Mr. Coleman's pain became manageable following injection therapy but remains persistent, consistent with trigeminal neuropathy.
>
> Mr. Coleman's last visit with Dr. Glassman was on August 3, 2015. At the time he reported low-grade left-sided headache that is constant and diminished since the trauma. Injection therapy of the ganglion was performed that day and the gabapentin was increased to 2400 mg daily.

(Ex. F. at 1.)  Dr. Malizia added that he and Dr. Anthony Polit had assumed Plaintiff's care after Dr. Glassman retired in December 2015, and Plaintiff was first seen in their practice on June 3, 2016, following the second motor vehicle accident which occurred on May 25, 2016. (*Id.* at 1-2.)  After stating that Plaintiff's diagnoses include "painful traumatic trigeminal neuropath (PTTN)" and outlining the plan of treatment, Dr. Malizia noted that "[d]espite pharmacotherapy and injection therapy performed from monthly to weekly depending on symptoms, Mister Coleman's pain has remained persistent."  (*Id.* at 2.)

The parties agree that Dr. Malizia concluded in his report that

[i]t is known that the pain lasting beyond the acute phase resulting in the chronic condition of painful cranial neuropathy results in an altered central nervous system leaving the patient with increased cortical excitability. *Hence, the first MVA set the stage. It is difficult if not impossible to know what the second MVA would have resulted in, given the occurrence and sequelae of the first MVA.*"

(Doc. 40 ¶ 49 (quoting Ex. F at 3) (emphasis added by Defendant)).)  Defendant's quotation omits the first two sentences of the paragraph which state as follows: "The prognosis for the condition as a result of the first MVA is poor.  The prognosis for the condition resulting from the second MVA is poor."  (Ex. F. at 3.)

Earlier in the report, Dr. Malizia explained that, based on his review of the report of the dental peer review conducted by Richard Koup, D.M.D. (which had been conducted at CR Marshal's request in October of 2017) as well as his knowledge of the literature and his experience

the prognosis for fully recovery from this painful cranial neuropathy is poor.  We anticipate the need for indefinite continuing care.  The current state of

7

> knowledge does not have a cure.  Both MVAs have contributed.  Mr. Coleman's
> pain was managed.  It was not cured, following the 6/[4]/2015 MVA.  The pain
> was mainly left sided.  The pain is now bilateral.  The second MVA on 5/20/2016
> began a process of the pain condition anew.

(Ex. F. at 2.)

At his deposition, Loethen explained his evaluation and analysis of Dr. Malizia's June

25, 2018, report.  (Doc. 40 ¶ 50; Doc. 49 ¶ 50.)

Preceding the following exchange, Loethen testified that he looked at Dr. Malizia's

letter as a whole.  (Loethen Dep. 57:25-58:1 (Ex. G).)

> Q. Okay. And what did you do with his whole letter as a whole?
>
> A. II, I found the very last paragraph, last sentence to be somewhat concerning
> that this medical provider says it is difficult, if not impossible, to know what the
> second MVA would have resulted in.
>
> So there's someone with medical experience that I don't have not even
> tying this right-sided trigeminal neuralgia to the second motor vehicle accident.
>
> Q.  Are you saying that this entire report taken as a whole does not tie to
> trigeminal neuralgia on the right side to the second motor vehicle accident,
> meaning the one in 2016?
>
> . . . .
>
> A.  My interpretation is that I saw no mechanism of injury to cause this.  And it
> seemed that this writer of this report reaches that – or strengthens that
> conclusion.
>
> Q. Okay.  So again, you saw no tie in this report between the accident that
> occurred in May of 2016 and the right-sided trigeminal neuralgia?
>
> . . . .

A.  I'm not seeing any type of causation affiliated with this accident.  Mr. Coleman is wearing a seat belt.  He does not at the emergency room that he goes to, the urgent care, complain of any type of facial or mouth injury.  They check that out.  The notation of those records is that, to my recollection, everything is normal.  There's nothing that is injured or causing them concern for that.

We've got Mr. Coleman seeking medical treatment from the individuals who were giving him his left-sided trigeminal injections about a month after his accident.  And I believe it's exactly about a month . . . .  There's no reference to anything to the right side.  And then maybe two weeks after that visit, he then makes a complaint.  There's nothing that I can see that would tie this accident to this trigeminal complaint.

Q.  So looking at the . . . paragraph that starts with "This statement by the independent examiner," and looking at the last three sentences, and I'll read them into the record. "Mr. Coleman's pain was managed.  It was not cured, following the 6/[4]/2015 MVA.  The pain was mainly left sided.  The pain is now bilateral.  The second MVA on 5/20/2016 began a process of the pain condition anew."

You didn't take that to tell you anything about causation from the second accident in May of 2016?

. . . .

A.  It says, "The second MVA on May 20, 2016, began a process of the pain condition anew."

I interpret that to mean the left side was possibly exacerbated, the preexisting.

Q. Well, you know under Pennsylvania law that a claimant is entitled to recover for an aggravation of a preexisting condition; is that right?

. . . .

A.  I would assume that, yes, that if something's been exacerbated in an accident, you had need to, for me, get a baseline established and then you

would look and see what the additional complaints are to determine . . . what are the new damages.

Q.  And we have the sentence, "Mr. Coleman's pain was managed, it was not cured, following the 6-2015 MVA." . . . And read that in conjunction with after the second MVA on May 20, 2016, [sic] it began a pain process of the pain condition anew, that doesn't give you an aggravation in your mind?

A.  That would stimulate to me that, yes, that this doctor is concluding that the record accident he had of what we're here for today caused additional searing in the preexisting left side.

Q.  And did you have any records, evaluations, medical reports to the contrary . . . at the time [you were] evaluating the claim?

A.  No, I don't believe that there was anything submitted to counter that.

Q.  Okay.  And are you aware of the standard in Pennsylvania as to the degree of certainty that an expert needs in order to give an opinion in court?

A.  I don't know.

Q.  Okay.  Yet, you drew a conclusion that this last sentence or last paragraph of this report is something concerning?

        . . . .

A.  . . . I drew a conclusion that there were conflicting statements in the same document.

Q.  Did you ever schedule a statement under oath of Mr. Coleman?

A.  I did not.

Q.  Did you ever schedule a medical examination of Mr. Coleman?

A.  An IME?

Q.  Yeah.

A.  I did not.

(Loethen Dep. 58:2-63:3 (Doc. 40-8).)  Loethan continued that, under the policy, he would

have had the right to make a recommendation to his supervisor to request an IME and he

also could have requested a statement under oath from Plaintiff.  (*Id*. 63:4-16.)

In his July 5, 2018, letter to Plaintiff's counsel, Loethen indicated that he had

received other medical records but the bills from those services were not provided.  (Doc.

40 ¶ 55; Doc. 49 ¶ 55.)  Loethen requested that Plaintiff's counsel provide copies of bills

and receipts for other out-of-pocket medical expenses Plaintiff wanted to be considered in

the evaluation.  (*Id*.)

On July 5, 2018, Loethen completed an evaluation of medical records submitted by

Plaintiff's counsel.  (*Id*. ¶ 56.)  By letter of July 6, 2018, and telephone call on July 9, 2018,

Loethen reached out to Plaintiff's counsel to work towards resolution of the UIM claim and to

inquire about Plaintiff's counsel's valuation of the claim.[5]  (*Id*. ¶ 56.)

By letter of July 10, 2018, Loethen sent Plaintiff's counsel a Medical Authorization

Form and Provider List.  (*Id*. ¶ 56.)  Loethen said he needed these forms completed so that

he could request the medical bills and treatment notes associated with the accident which

he would review upon receipt.  (*Id*.)   He added that he "hope[d] this explains the process

and clarifies what we need to evaluate your claim."  (Ex. C. at 172.)  Loethen spoke with

_____

[5] On the same date as the Evaluation, Loethen sought approval for a reserve of $25,247.25 and payment up that that amount.  (Ex. B at 166.)  On the same day a $20,000 reserve was approved.  (Id. 167-68.)

Plaintiff's attorney on August 8, 2018, at which time Loethen noted that Plaintiff's counsel "did not give an opinion on the value of the claim, said he has no idea." (Ex. B at 179.) Loethen also noted that Plaintiff was still treating, his knee had "really flared up," and he was going to Sleep Masters for bilateral trigeminal nerve injections." (*Id.* at 180.)

Loethen and Plaintiff's counsel continued to communicate and treatment records were updated through early February 2019. (Doc. 40 ¶¶ 62, 64-80; Doc. 49 ¶¶ 62, 64-80.) In his February 5, 2019, letter to Plaintiff's counsel, Loethen said he had difficulty obtaining treatment notes from Dr. Paul Rutkowski, Plaintiff's primary care physician, and asked counsel to advise whether he wanted Loethen to proceed with an evaluation without the notes. (*Id.* ¶ 80.) Plaintiff's counsel agreed to proceed with the evaluation of the UIM claim without Dr. Rutkowski's notes. (*Id.*)

By letter dated February 28, 2019, CR Ty Haas informed Plaintiff's counsel that he had been reassigned for claim review and he would review the medical records and make an offer. (*Id.* ¶ 81.) The Claims File indicates that Haas noted that the information obtained by Defendant showed a "'substantial claim history and multiple injuries'" and a similar 2015 accident resulted in injuries to Plaintiff's face and mouth. (*Id.* ¶ 83 (quoting Ex. B at 264).) Haas also noted that Plaintiff claimed transmission damage and bumper damage to the absorber, Defendant did not find any damage to either but paid for the bumper damage, and the damage alleged "'would not support claims of being struck from behind by a car traveling at 20 MPH.'" (*Id.* ¶ 84 (quoting Ex. B at 269).)

Defendant's evaluation of the claim included the following assessment: "considering Plaintiff's 'significant claims history' with similar injuries, poor mechanism of injury, and minimal damage to Plaintiff's car; the 'injury and mechanism are questionable.'" (*Id*. ¶ 85 (quoting Ex. B at 271, 273).)

The offer letter Hass sent to Plaintiff's counsel on March 14, 2019, advised as follows:

> Based on the information we have obtained, we are willing to offer $72,500 . . . inclusive of all liens and in exchange for the attached release.
>
> We reserve our right to retract this offer at any time as we continue to review Mr. Coleman's claim.  We are attempting to obtain the video surveillance referenced in the police report and we are still awaiting additional medical billing and records that have been ordered.
>
> We will consider any counter offers Mr. Coleman presents, but we will likely need additional reports including, but not limited to, an examination under oath, independent medical examinations, as well as prior dental records and additional prior medicals not listed on the provider list we currently have.
>
> If your client accepts the settlement, please have your client execute the enclosed release. . . .
>
> If you have any questions or concerns call me at (913)577-7843.   My scheduled office hours are Monday through Friday from 8:00 a.m. to 5:00 p.m. Central Time.

(Ex. H at 1; *see also* Doc. 40 ¶¶ 86-87, Doc. 49 ¶¶ 86-87.)

Defendant's settlement offer letter was accompanied by the following release:

UNDERINSURED MOTORIST RELEASE OF
CLAIMS AND RIGHTS

FOR AND IN CONSIDERATION OF THE SUM OF $72,500.00 (Seventy Two Thousand Five Hundred Dollars), receipt of which is hereby acknowledged, I/we hereby release and forever discharge Foremost Insurance Company Grand Rapids, Michigan ("the Insurer"), its principals, agents and representatives, from any and all rights, claims, demands and damages of any kind, known or unknown, existing now or arising now or in the future, with respect to the personal injuries received and the causes of action for those injuries arising from the automobile accident of May 25, 2016 at or near Wilkes Barre Twp, PA.

It is further expressly acknowledged that this release is given in full satisfaction of all claims which the undersigned might have under Policy 8079133956, issued by Foremost Insurance Company Grand Rapids, Michigan, to David Coleman, and in particular, is a release of all claims or rights of action with respect to any claims for underinsured motorist benefits as provided by said policy.

(*Id.* ¶ 95; Ex. H.)

Haas testified that Plaintiff's counsel never called him with any concern regarding the proposed release. (*Id.* ¶ 98.)

At claims representative Ty Haas's deposition on January 29, 2020, he testified regarding his evaluation and analysis of the dental peer review report dated October 9, 2017, by Richard Koup, D.M.D., and records from Don Malizia, D.D.S. and Anthony Polit, D.M.D., at Allentown Pain & Sleep Centers/Northeastern Sleepmasters L.L.C. (Doc. 40 ¶ 88; Doc. 49 ¶ 88.) Haas testified that he understood Dr. Koup's report to state that if Plaintiff suffered trigeminal neuralgia that resulted from the May 25, 2016, accident, then the treatment he was receiving at Allentown Pain & Sleep Centers/Northeastern Sleepmasters L.L.C. was reasonable. (*Id.* ¶ 89.) Haas also testified that his concern with Dr. Koup's report was that the doctor mis-stated the mechanism of the May 25, 2016, accident which

was not supported by any of the medical or other records, and Mr. Haas questioned the

causation of the trigeminal neuralgia conditions after the May 25, 2016, accident. (*Id.* ¶ 90.)

By email dated March 21, 2019, Plaintiff's counsel advised that Plaintiff rejected the

$72,500 offer and that without an increased offer, Plaintiff will file suit. (*Id.* ¶ 91.)  By email

dated March 21, 2019, Mr. Haas responded and asked for a counter-offer to Foremost's

offer.  (*Id.* ¶ 92.)  By email dated March 22, 2019, Plaintiff's counsel reiterated his position,

did not make a counter-offer, and did not engage in negotiations. (*Id.* ¶ 93.)

Plaintiff alleges in the Complaint that Foremost "'[t]hreatened the Plaintiff with

retaliatory action if he did not accept the $72,500 offer by stating that the offer could be

retracted'" and that a higher offer would require Defendant to obtain additional pre-accident

medical records and other information. (*Id.* ¶ 44 (quoting Ex. A, ¶ 43(i).)

By letter dated March 28, 2019, Haas informed Plaintiff's counsel that Defendant

needed additional information from Plaintiff to understand the claimed diagnosis of

trigeminal neuralgia.  (*Id.* ¶101.)  In the letter, Haas asked to schedule an independent

medical examination (IME) with Dr. Paul Shipkin.  (*Id.* ¶ 102.)  Haas stated that in addition

to the current medical records and bills, Dr. Shipkin may need to review additional prior

medical records given Plaintiff's history of numerous prior injuries, accidents, and claims

which may have contributed to Plaintiff's medical conditions and bi-facial trigeminal

neuralgia, including facial injuries dating to 2006. (*Id.*)  As such, Haas requested that

Plaintiff complete the enclosed provider list to enable Foremost to request prior medical

records, focusing on dental providers and neurologists. (*Id*.)   Haas also requested that

Plaintiff submit to Foremost any EMG or MRI studies that confirm the trigeminal neuralgia

diagnosis.  (*Id.* ¶ 103.)  Plaintiff never responded to this request or submit any EMG

or MRI studies.  (*Id.* ¶ 104.)

On April 3, 2019, Plaintiff filed this lawsuit against Defendant alleging breach of

contract and bad faith.  (Id. ¶ 105.)

On April 16, 2019, Haas was informed by U.S. Legal (third-party administrator) who

was handling the record requests that Active Performance Chiropractic refused to provide

the medical bills and has given all bills to Plaintiff's counsel, and that the provider requested

that Defendant obtain the information from Plaintiff's counsel.  (*Id.* ¶ 105.)

Prior to the start of oral discovery in October 2019, Plaintiff's counsel made a

counter-demand of $250,000.  (Doc. 49 ¶ 199; Doc. 51-1 ¶ 199.)  Haas testified at his

January 29, 2020, deposition that he responded to the October 2019 counter as "let's try to

mediate." (Haas Dep. 120:4-9 (Ex. I).)  Haas confirmed that the mediation had not yet been

scheduled and he did not know why.   (Id. 121:1-15.)

On November 1, 2019, Defendant's counsel responded to an email from Plaintiff's

counsel:

> Concerning your inquiry as to a stipulation of liability, the UIM carrier prefers to
> await completion of depositions of the investigating police officer and Sara
> Katrenicz before making a final determination in this regard.

As far as your settlement demand is concerned, the UIM carrier is continuing with its medical investigation and as such, is not in a position to engage in such negotiations at the present time.

(Pl's Ex. 6 at 1 (Doc. 49-6).)

At Wilkes-Barre Detective Lee Ann Reh's November 12, 2019, deposition, she testified that she watched a video generated at a nearby equipment rental store which she assessed to show the Katrenicz vehicle making contact with Plaintiff's vehicle as the two vehicles were approaching the stop sign.  (Doc. 40 ¶ 159; Doc. 49 ¶ 159; *see also* Reh Dep. 11:12-13:3 (Ex. V).)  Reh testified that the video had been uploaded to the police department's computer and was lost when the computer crashed.  (*Id.* ¶ 165.)  She also testified that she believed that she had seen both vehicles coming up the ramp but could not recall whether she had seen Plaintiff's vehicle stopping and moving as it approached the stop sign.  (*Id.* ¶ 162; Reh Dep. 51:10-20.)

After this deposition, Defendant requested mediation in response to Plaintiff's October $250,000 demand.  (Doc. 40 ¶ 199; Doc. 49 ¶ 199.)  Mediation was scheduled for May 11, 2020.

At Sara Katrenicz's February 24, 2020, deposition she recounted the events of May 25, 2016, as follows:

"Well, he was going very slow. And that's like a high-traffic area, so I noticed that. And then when we got up towards the stop sign, he started—like, he stopped before the stop sign. He stopped, like normally, and then he would start to go and then slam on his brakes and then start to go again and slam on his brakes. And that happened, like, I'd say three or four times before we actually got to the stop sign. And the—I don't know if you know that road, but

17

the stop sign's here and there's like a main highway. So he got to the stop sign
officially and then, you know, there was no traffic coming, so he sat there for,
like, a minute or so. And then he did it again; like, he pulled forward real fast
and then slammed on his brakes and then—there was no cars coming, like in
front of us, so then I was just behind him and then that's it."

(Doc. 40 ¶ 140 (quoting Katrenicz Dep. 12:10-13:1 (Ex. P)); Doc. 49 ¶ 140.[6])  When asked if

her vehicle ever came into contact with the rear of the Coleman vehicle, Ms. Katrenicz

answered, "Not that I felt at all. No, nothing . . . ."  (Doc. 40 ¶ 141 (quoting Katrenicz Dep.

13:2-5); Doc. 49 ¶ 141.)

On April 15, 2020, Defendant made a counter-offer of $92,500 to Plaintiff's demand

of $250,000.  (*Id.* ¶ 199.)  Plaintiff then reduced his demand to $230,000.  (*Id.*)

Before the mediation, Defendant disclosed the reports of Barry Hendler, M.D., and

Paul Shipkin, M.D.  (*Id.* ¶ 200.)  Defendant's engineering report was later disclosed. (*Id.*)

The UIM claim was settled for $150,000 at the May 11, 2020, mediation.  (Doc. 48 at

18; Pl.'s Ex. 1 at 1.)

At his May 29, 2020, teleconference deposition, Defendant's counsel initiated the

following exchange regarding bad faith:

Q.  Now, the last sentence of paragraph 43(a) [of the Complaint] says: "In
response to the foregoing and as previously noted, Foremost's claim
representative only offered $72,500 to settle the UIM claim, a figure which is
deemed so absurdly low as to constitute bad faith."

A.  Yes.

---

[6] Katrenicz's June 22, 2016, statement to her insurer Geico was similar to her deposition testimony
regarding Plaintiff stopping and starting his vehicle.  (*See* Doc. 40 ¶ 137.)

(Doc. 40 ¶ 167; Coleman Dep. 116:11-19 (Ex. K).)  Thereafter, Plaintiff was advised by his counsel not to answer several questions about claims valuation and bad faith.  (Doc. 40 ¶¶ 167-185; Doc. 49 ¶¶ 167-185.)

Regarding the reporting of right-sided facial pain after his May 25, 2016, accident, Plaintiff confirmed at his teleconference deposition that he first told Dr. Polit and/or Dr. Malizia that he had pain on the right side of his face on July 12, 2016.  (Coleman Dep. 83:25-84:9; Doc. 40 ¶ 129.) The Progress Note from Plaintiff's July 6, 2016, visit with his primary care provider, Dr. Rutkowski, indicates in the CC/HPI (current complaints/history of present illness) section that Plaintiff complains of ongoing pain to the left facial area.  (Ex. X at 1; Doc. 40 ¶ 49.)  In the Impression section of the note, only right elbow and knee issues were noted in relation to the May 2016 motor vehicle accident.  (Ex. X at 1.)  Plaintiff also testified that his treating doctors and dentists had never given a prescription for an MRI of his trigeminal nerve.  (Doc. 40 ¶ 186; Doc. 49 ¶ 186.)

Regarding employment, Plaintiff testified that, prior to May 25, 2016, through at least May 29, 2020, Plaintiff was self-employed as the owner of a self-storage facility, the owner/operator of a body shop located in Wilkes-Barre, Pennsylvania, and the owner/operator of Windows to the World, which does custom draperies and window treatments.  (*Id*. ¶¶ 194-197.)  He explained that Windows to the World is operated out of his home and he goes to customer's homes to provide shop-at-home service.  (*Id.* ¶ 196.)

Plaintiff did not claim any wage loss as part of his claim for underinsured motorist benefits related to the May 25, 2016, accident. (*Id.* ¶ 193.)

Plaintiff received $15,000 in settlement of his tort claim against Sara Katrenicz arising out of the May 25, 2016, accident. (*Id.* ¶ 198.)

### III. STANDARD OF REVIEW

Summary judgment "is appropriate only where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Gonzalez v. AMR*, 549 F.3d 219, 223 (3d Cir. 2008). "An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law." *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact." Fed. R. Civ. P. 56(a).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). Therefore, the non-moving party may not oppose summary

judgment simply on the basis of the pleadings, or on conclusory statements that a factual issue exists. *Anderson*, 477 U.S. at 248.  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A)-(B).  In evaluating whether summary judgment should be granted, "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3).  "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied* 507 U.S. 912 (1993).

However, "facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007).  If a party has carried its burden under the summary judgment rule,

> its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact. When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court

21

should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

*Id.* (internal quotations, citations, and alterations omitted).

"In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of evidence." *Anderson*, 477 U.S. at 255. Therefore, when evidentiary facts are in dispute, when the credibility of witnesses may be in issue, or when conflicting evidence must be weighed, a full trial is usually necessary.

## IV. ANALYSIS

Defendant asserts that it is entitled to summary judgment on Plaintiff's bad faith claim, the only claim remaining in this action, because there "is insufficient evidence to demonstrate to a jury, by clear and convincing evidence that . . . Defendant did not have a reasonable basis for Defendant's handling and evaluation of Plaintiff's underinsured motorist claim . . . and Defendant knew or recklessly disregarded its lack of a reasonable basis in handling and evaluating the UIM claim." (Doc. 47 at 1.) In his opposition brief, Plaintiff's identified grounds for his bad faith claim includes litigation-related matters and a timeframe of alleged delay from March 14, 2019, to May 11, 2020, i.e., the period from the initial offer to the settlement of his UIM claim. (Doc. 48 at 8-18.) In its reply brief, Defendant argues that asserted grounds for bad faith not raised in Plaintiff's Complaint should not be considered by the Court. (*See* Doc. 51 at 2, 11, 15, 20.) In each instance, Defendant also responds substantively to Plaintiff's arguments. (*Id.*) Given this briefing posture, the Court

will address the merits of the grounds now asserted by Plaintiff in support of his bad faith claim.

The Pennsylvania legislature has created a statutory remedy for an insurer's bad faith conduct, which reads as follows:

> In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:
>
> > (1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.
> >
> > (2) Award punitive damages against the insurer.
> >
> > (3) Assess court costs and attorney fees against the insurer.

42 Pa. Cons. Stat. Ann. § 8371.

"The standard for bad faith claims under § 8371 is set forth in *Terletsky v. Prudential Property & Cas. Ins. Co.*, 437 Pa. Super. 108, 649 A.2d 680, 688 (1994), *appeal denied*, 540 Pa. 641, 659 A.2d 560 (1995)." *Klinger v. State Farm Mut. Auto. Ins. Co.*, 115 F.3d 230, 233 (3d Cir. 1997). *Terletsky* defined the term "bad faith" as follows:

> In the insurance context, the term bad faith has acquired a particular meaning: "Bad faith" on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (i.e., good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith.

*Terletsky*, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed. 1990)).  "[T]o recover under a claim of bad faith, the plaintiff must show that the defendant did not have a reasonable basis for denying benefits under the policy and that defendant knew or recklessly disregarded its lack of reasonable basis in denying the claim."  *Id.*  Reckless behavior can include "acts done with a bad motive or with a reckless indifference to the interests of others."  *Polselli v. Nationwide Mut. Fire Ins. Co.*, 23 F.3d 747, 751 (3d Cir. 1994).  "Proof of an insurance company's motive of self-interest or ill will is not a prerequisite to prevailing in a bad faith claim under § 8371."  *Rancosky v. Washington National Ins. Co.*, 170 A.3d 364, 365 (Pa. 2017).  Rather, a plaintiff can prevail without such a showing although evidence of self-interest or ill will is probative of the second *Terletsky* element, i.e., whether the insurer knew or recklessly disregarded its lack of a reasonable basis for its action. *Id.*

> Even questionable conduct giving the appearance of bad faith is not sufficient to establish it so long as the insurer had a reasonable basis to deny coverage. [J.*C. Penney Life Ins. Co. v. Pilosi*, 393 F.3d 356, 367 (3d Cir. 2004)] (affirming summary judgment in insurer's favor on bad faith claim because there was a reasonable basis to deny coverage, even though insurer took inconsistent coverage positions in other situations and made false statements in its marketing materials). *See O'Donnell v. Allstate Ins. Co.,* 734 A.2d 901, 906–10 (Pa. Super. Ct. 1999) (explaining that, while bad faith "may also extend to the insurer's investigative practices," in the absence of evidence of a dishonest purpose or ill will, it is not bad faith for an insurer to take a stand with a reasonable basis or to "aggressively investigate and protect its interests").

*Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012).

An insurer's delay in responding to an insured's communications, poor response time in engaging an investigator, and poor response time in conducting an investigation are relevant considerations when determining whether an insurer acted in bad faith. *Id.* at 752. As *Polselli* noted, such behavior may suggest that the insurer "did not 'accord the interest of its insured the same faithful consideration it gives its own interest.'" *Id.* (quoting *Cowden v. Aetna Casualty and Surety Co.*, 134 A.2d 223, 229 (Pa. 1957)).

Bad faith cannot be merely insinuated. *Terletsky*, 649 A.2d at 688. "Bad faith must be demonstrated by clear and convincing evidence even at the summary judgment stage. A reasonable basis is all that is required to defeat a claim of bad faith." *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 523 (3d Cir. 2012) (citation omitted).

> Th[e] heightened [clear and convincing evidence] standard requires evidence "so clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *Bostick v. ITT Hartford Grp.,* 56 F. Supp. 2d 580, 587 (E.D. Pa.1999) (citations omitted). "Thus, the plaintiff's burden in opposing a summary judgment motion is commensurately high in light of the substantive evidentiary burden at trial." *J.C. Penney Life Ins. Co. v. Pelosi*, 393 F.3d [356, 367 (3d Cir. 2004)]. "In a bad faith case, summary judgment [in favor of the insurer] is appropriate when there is no clear and convincing evidence that [its] conduct was unreasonable and that it knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Bostick,* 56 F. Supp. 2d at 587.

*Post*, 691 F.3d at 523. In other words, "all that is needed to defeat a claim of bad faith under § 8371 is evidence of a reasonable basis for the insurer's actions or inaction." *Gibson v. State Farm Mutual Automobile Ins. Co.*, 994 F.3d 182, 191 (3d Cir. 2021) (citing *J.C. Penney*, 393 F.3d at 367).

As a general matter, Defendant argues that its evaluation and handling of Plaintiff's UIM claim was reasonable for several reasons, including its assessment that medical, dental, and chiropractic records were not "undisputed and uncontradicted" as Plaintiff averred in his Complaint (Doc. 47 at 8 (citing Doc. 1 ¶ 43(a)) and numerous red flags were raised from the inception of the claim (*id.* at 2-5, 9).  Defendant identifies ten red flags: 1) Plaintiff had many injury claims for fourteen prior accidents; 2) Plaintiff reported only one injury in his interview six days after the accident—a fractured bone chip in his back for which no treatment was possible; 3) Plaintiff purchased the $500,000 policy with $100,000 of extra medical coverage one month and four days before the accident; 4) the vehicle identification number ("VIN") in the application did not match the VIN on the car involved in the accident; 5) when Plaintiff applied for PIP benefits on July 6, 2016, he claimed new injures of "pain on right side from knee to ankle, pain on left side from neck down left arm to wrist, teeth/jaw, right side of face"  2016, injuries which were not mentioned in emergency room records; 6) Plaintiff claimed his transmission and right bumper shock absorber were damaged in the rear-end collision when inspection of them showed no such damage; 7) in an October 2, 2017, deposition in a prior case, Plaintiff testified that he wanted vision therapy for his concussion and gamma knife surgery for his trigeminal neuralgia but his auto policy benefits were running out; 8) the June 25, 2018, Malizia report indicated, among other things, that Plaintiff had never been diagnosed or treated by a neurologist for right-sided trigeminal neuraligia rather his treatment was by two pain management dentists and Dr. Malizia could

not give an opinion of causation, commenting "[i]t is difficult if not impossible to know what

the second MVA would have resulted in, given the occurrence and the sequalae of the first

MVA" (Ex. F); 9) the treating dentists had not ordered any imaging of Plaintiff's trigeminal

nerve that would have shown whether his claimed trigeminal neuropathy was caused by

accident or disease; and 10) Plaintiff's medical records showed he had significant issues

with the right side of his face and mouth proper to May 25, 2016, including  right-sided facial

pain, right-sided jaw arthralgia, surgery in his upper right jaw to implant bone and then to

remove it after the bone cracked in the June 4, 2015, accident, treatment and surgery for an

infected wound to his upper right gum and jawbone caused by the sideways movement of

his upper denture in the June 4, 2015, accident, and repeated injections of pain killers (Ex.

K at 138:3-140:6; Ex. T).

The Court will now turn to Plaintiff's specific allegations of unreasonable conduct on

the part of Defendant in delaying the payment of Plaintiff's UIM claim.  As noted above, in

response to Defendant's Summary Judgement Motion, Plaintiff asserts that the relevant

period is the delay from March 14, 2019, to May 11, 2020, i.e., the period from the initial

offer to the settlement of the UIM claim.  (Doc. 48 at 18.)

## A. Delay Caused by Defendant's Initial Offer and Accompanying Release

Plaintiff alleges that Defendant's initial offer showed bad faith because the claim was

valued at a minimum of $150,000 at the time it made an offer of $72,500.  (Doc. 48 at 8.)

Defendant contends that the basis for this assertion is flawed in that the claim was not

valued at $150,000 at the time.  (Doc. 51 at 3.) The Court concludes that Plaintiff has not

shown by clear and convincing evidence that Defendant's conduct related to its first offer

was unreasonable and that Defendant knew or recklessly disregarded its lack of a

reasonable basis for valuing the claim at $72,500.

Plaintiff maintains that the reassignment of the claim from David Loethen to Ty Haas

in late February 2019 shows that the claim had been valued at no less than $150,000 when

Haas sent the March 14, 2019, offer letter to Plaintiff's counsel because Loethen had to

value the claim at $150,000 to trigger the reassignment and, therefore, the offer at less than

the assigned value shows bad faith.  (Doc. 48 at 8.)   Defendant asserts that the claim was

transferred to Haas, a claims representative in the Large Loss Unit, "due to the nerve

damage allegations and the policy limits of $500,000" and the offer was the mid-point of the

range value at which it estimated the claim.  (Doc. 51 at 3.)

The record shows that Loethen's testimony on the issue of valuation does not

establish that $150,000 was the minimum valuation of the claim.  Testifying about his

communication with his supervisor about escalating the claim to a mid-complexity or large

loss adjuster, the following exchange occurred:

Q.  So why did you draw the conclusion that this needed to be elevated?

A.  I determined that it should be elevated because an evaluation that I did on
this that made me determine in my mind, although I'm not a medical
professional, and I saw no evidence whatsoever of Mr. Coleman hitting his face
on anything.  The question of the right-sided trigeminal neuralgia, if, if some
chance that that was caused in this accident, then I felt if that could be proven,

then my general damages were at a level that would require it to be handled by more of a mid complexity or large loss adjuster.

Q. What level of damages would that be?

. . . .

A. So that would be if a claim value reaches 150,000 or higher.

. . . .

Q. Did you ever . . . assign an offer value while you were handling the claim before it was reassigned?

A. I speculated that if this could be related, possibly what the value might be.

. . . .

Q. Did you ever have a discussion with your supervisor when you made the decision that this claim . . . needed to be elevated to get your supervisor's approval of that?

A. I believe that after I did my evaluation and I made the consideration that if, in a far-reaching world this was caused in this accident, that – so I let them know that yes, if I felt that this claim was connected or these damages were connected in some way, I made a request to either extend authority to me or to get it assigned to the large loss team.

(Loethen Dep. 49:15-52:24 (Ex. G).)

Loethen's qualification regarding causation is consistent with his testimony about his analysis of Dr. Malizia's report when he testified that he looked at Dr. Malizia's June 25, 2018, report as a whole. (Loethen Dep. 57:25-58:1.) His testimony about the report includes the following statements:

- "I found the very last paragraph, last sentence to be somewhat concerning that this medical provider says it is difficult, if not impossible,

to know what the second MVA would have resulted in." (Loethen Dep. 58:4-8.)

- "My interpretation is that I saw no mechanism of injury to cause this. And it seemed that this writer of this report reaches that – or strengthens that conclusion." (*Id.* 58:21-24.)

- "I'm not seeing any type of causation affiliated with this accident. Mr. Coleman is wearing a seat belt. He does not at the emergency room that he goes to, the urgent care, complain of any type of facial or mouth injury. They check that out. The notation of those records is that, to my recollection, everything is normal. There's nothing that is injured or causing them concern for that.

  We've got Mr. Coleman seeking medical treatment from the individuals who were giving him his left-sided trigeminal injections about a month after his accident. And I believe it's exactly about a month . . . . There's no reference to anything to the right side. And then maybe two weeks after that visit, he then makes a complaint. There's nothing that I can see that would tie this accident to this trigeminal complaint." (*Id.* 59:6-24.)

- "It says, 'The second MVA on May 20, 2016, began a process of the pain condition anew.' I interpret that to mean the left side was possibly exacerbated, the preexisting." (*Id.* 60:14-17.)

- "No, I don't believe that there was anything submitted to counter [the report]." (*Id.* 62:1-2.)

The record shows that Loethen sought authority for a reserve of $25,247.26 and settlement authority up to the same amount on July 5, 2018, after his evaluation of the records submitted by Plaintiff's attorney and the request was approved on the same day. (Ex. B at 166-67.)

The potential nature of a larger settlement expressed in Loethen's testimony is consistent with his February 25, 2019, claim evaluation where he states regarding Plaintiff's

right-sided facial pain that it "appears unlikely R-side face pain related to MVA.  No mention of such pain for 6 wks and no reported injury to face/mouth immed after MVA.  Physical exam of head noted to be atraumatic, mouth noted to be clear w/moist mucous membranes, buccal mucosa & normal tongue."  (Ex. B at 217.)  Regarding general damages, Loethen notes

> Spinous process tip fx, aggravated neck & back, R knee bruise, L shoulder bruise, 3 chiro. Visits.  Chronic lingering pains of neck/back after chiro, knee pain, and R-side face pain don't have an organic cause from this low velocity impact.  Clmt's pre-exisitng medically impaired state more like is reason for lengthy trx.

(*Id.* at 218.)  Another February 25, 2019, entry regarding "Negotiation" lists "strengths" related to right-sided facial pain to include the following: Dr. Rutkowski's evaluation at Plaintiff's July 6, 2016, checkup of "ongoing pain on left side of face" a note regarding "new MVA with contusions to right elbow and right knee"; and Pain/Sleep Center's records which showed that "R-side facial pain 1st noted 7 weeks post MVA. No causal support from MVA." (*Id.* at 218-19.)

The day after this evaluation, the claim was reassigned to Haas who sent a letter to Plaintiff's counsel on February 28, 2019, indicating that he would review the file and get back to him as soon as he could, understanding that Plaintiff was awaiting an offer.  (Ex. C at 213.)  On March 1, 2019, Haas noted "[a]ppears that all needed records and billing are in file, atty for insured awaits an offer.  Will need to fully review all meds and evaluate UIM injury claim."  (Ex. B. at 232.)

On March 11, 2019, Haas requested a reserve amount of $45,000.[7]  (Ex. B. at 323.)

Haas's March 14, 2019, evaluation states that "[d]espite facial neuralgia has poor

MOI and not clearly established at this time, he has support from a pain clinic and MED PIP

peer review accepts treatment as reasonable, although, it clearly confused our loss with the

2015 loss." (Ex. B at 270.)  The following entry on that date from Katherine Rodriguez

states that she

> [r]oundtabled this claim with GA and discussed concerns over claimant's
> significant claims history, nature of this loss and extent of facial nerve injury
> being alleged.  This injury and mechanism are questionable which is reflected
> in the evaluation as well as [redacted].  With the medical supports on file, we
> are making an offer in good faith and will attempt to resolve.

(*Id.* at 271.)  Though several following entries are redacted, less than thirty minutes after

Rodriguez's entry a reserve request made by Haas was approved and a reserve of

"$100,000 or more" was "created or updated." (*Id.* at 272.)  Other records indicate that the

reserve amount as of that date was $112,500. (*Id.* at 323.)  On the same day, Haas sent

the letter to Plaintiff's counsel offering $72,500. (Ex. H at 1.)  In his claim file noting that an

offer had been sent for $72,500, redacted information is followed by "past claim history,

---

[7] While certain information regarding reserves is supported by the record, Defendant's averments
regarding reserve ranges and the reasons for them cannot be verified by Defendant's accompanying
citations which include heavily redacted Claims Summary Report notes. (*See* Doc. 51 at 4 (citing, *inter
alia*, Ex. B at 270-272).) Thus, reserve information considered by the Court is only that which is verifiable in
the Claims Summary Report, Defendant's Exhibit B.  Similarly, Defendant proffers other Summary Claims
Report information regarding Haas's evaluations and a nurse consultant's mechanism of injury assessment
which cannot be verified by the record due to redactions on the cited pages. (*See* Doc. 51 at 4-5 (citing Ex.
B at 177-79).)  Further, the cited pages predate Haas's involvement in the claim. (*Id.*)  Therefore, the Court
gives no evidentiary weight to Defendant's averments based on the unverifiable cited material.

poor MOI, minimal damage.  He had to file suit to obain 15K from tort, so there may yet be additional information out there on this claim."  (Ex. B at 273.)

The foregoing record evidence discounts Plaintiff's assertion that bad faith is shown in Defendant's valuation of the claim (allegedly at $150,000) before making the March 14, 2019, offer.  The record demonstrates continuous and consistent questioning of the cause of Plaintiff's injuries and Claims Summary Report entries as well as deposition testimony from Loethen and Haas point to several bases for the uncertainty.  Plaintiff's speculation about the valuation of Defendant's claim in March 2019 is not supported by record evidence and cannot form the basis of finding, by clear and convincing evidence, bad faith in connection with the valuation

Plaintiff relatedly asserts that the release accompanying the offer which released all claims is further evidence of bad faith, asserting that "the act of sending an overinclusive release without prior discussion or agreement that all claims would be included in a settlement justifies a finding of bad faith on its own."  (Doc. 48 at 9-11 (citing *Hayes v. Harleysville*, 841 A.2d 121 (Pa. Super. Ct. 2003)).)  In support of the assertion, Plaintiff points to the following: the language in the offer letter stating that the offer was made in exchange for the release; the letter did not say that the release language was negotiable; Haas's testimony where he allegedly said that he sent the release to be "aggressive"; and Defendant's refusal to increase the offer after it was rejected which left Plaintiff no choice but to file suit.  (*Id.* at 10.)  Plaintiff characterizes the testimony as an "act of bravado . . .

indicative of ill will."  (*Id.* (citing *Bonenberger v Nationwide Mutual Ins. Co.*, 791 A.2d 378,

382 (Pa. Super. Ct. 2002) (actions intended to "send a message" constitute bad faith); 40

P.S. 1171.5(a)(10)(vii) ("compelling persons to institute litigation to recover amounts due

under an insurance policy by offering substantially less than the amounts due and ultimately

recovered in actions brough by such persons")).)

> In Hayes, the Superior Court found bad faith in the following circumstances:

> [Harleysville's counsel] advised Harleysville that Hayes was entitled to $100,000 of UIM coverage. After a discussion between counsel and members of Harleysville's management, Harleysville, with full knowledge that Hayes was entitled to $100,000 of coverage, offered to pay Hayes the full amount of the coverage *only* in exchange for a release of both the UIM claim and any potential bad faith claim. When Hayes refused to sign the release, Harleysville refused to pay the claim and forced the matter into arbitration. Again, we find that the trial court did not abuse its discretion by determining that this conduct constituted bad faith.

*Hayes,* 841 A.2d at 127–28.

> The facts of this case are readily distinguishable.  First, the insurer had an

opportunity to correct the release langauge and refused to do so in *Hayes* while here

Plaintiff refused the offer without any mention of a problem with the release.  Second, the

overly inclusive release in *Hayes* forced the matter into arbitration where here the release

itself had no appreciable effect on the subsequent course of events.

> Haas testified that he understood Plaintiff's problem with the release and his intent

was to release only the underinsured motorist claim, that Plaintiff's counsel never called him

about the release, he would have revised the release if asked, and, as a matter of practice,

release language is changed upon request fairly regularly. (Haas Dep. 127:5-15, 128:21-130:5 (Ex. I).) The salient fact in considering bad faith regarding the release is that Plaintiff's counsel did not mention the release at all after he received it with the offer. Even considering the inclusion of the broad release to be unreasonable conduct under the first prong of the *Terletsky* standard, under the second prong Plaintiff has not pointed to clear and convincing evidence that Haas knew or recklessly disregarded his lack of a reasonable basis to send the release. Haas's testimony that it was error which he would have corrected is uncontradicted. Plaintiff's assertion that Haas "testified that he sent the release with the offer to be 'aggressive' with Mr. Coleman" (Doc. 48 at 10) is an incorrect characterization of the record. In answer to the question "You're sending a message with this letter, aren't you?", Haas answered "No" and followed up with "I'm trying to match some of the aggressiveness Mr. Fendler was throwing at us." (Haas Dep. 136:15—22 (Ex. I).) Although before this question Haas had been asked about how often he sent out an offer letter with a release (*id.* 136:11-12), his mention of aggressiveness had nothing to do with the release and was a comment about Plaintiff's counsel's conduct and not his motivation for sending the release. Therefore, *Bonenberge*r does not guide the bad faith analysis in the circumstances here.

Rather, in considering bad faith in a UIM case, the Court must be cognizant of the adversarial nature of UIM claims. In *Condio v. Erie Ins. Exch.,* 899 A.2d 1136 (Pa. Super. Ct. 2006), the Pennsylvania Superior Court stated that "when it turns to issues such as

liability, damages, coverage or even procedure, U-claims become very much like third party claims. Simply stated, they are inherently and unavoidably arm's length and adversarial." *Id.* at 1143–44; *see also Zappile v. Amex Assur. Co.*, 928 A.2d 251, 256 (Pa. Super. Ct. 2007) (citing *Condio*, 899 A.2d at 1143-44) ("statement of the obvious" that UIM claim is "inherently and unavoidably adversarial")).

Further, although Plaintiff avers in his Answer to Defendant's Statement of Material Facts that "[o]ne of the reasons the offer was not acceptable was because it was teamed with a general release of all claims, including the PIP medical claim" (Doc. 49 ¶ 97), he testified that his Complaint correctly stated "Foremost's claim representative only offered $72,500 to settle the UIM claim, a figure which is deemed so absurdly low as to constitute bad faith." (Coleman Dep. 116:11-19 (Ex. K).) Thus, Plaintiff's Complaint relates the offer solely to a settlement of the UIM claim and Plaintiff considered the "absurdly low" nature of the UIM offer to constitute bad faith irrespective of the release. In these circumstances, delay cannot be attributed to the release.

For the foregoing reasons, Plaintiff's assertion that the March 14, 2019, offer and over-inclusive release sent with the offer letter is evidence of bad faith is not supported by clear and convincing evidence of record.

## B. Delay Caused by Switching Positions on Negligence

Plaintiff maintains that Defendant's attempt to defend the claim on the theory of a lack of impact between the vehicles caused delay and, because the theory was based only

on Katrenizc's statement, Defendant pursued this defense for an improper purpose, i.e., self-interest.  (Doc. 48 at 11-12.)  Defendant responds that it is not bad faith for an insurer to raise litigation defenses it is entitled to raise and, in fact, it never "switched" its position on litigation.  (Doc. 51 at 11, 12.)  Defendant also asserts that matters related to negligence did not delay the outcome of Plaintiff's UIM claim because the UIM claim settled at mediation before Defendant had received all of Plaintiff's medical records related to his prior injuries. (*Id.* at 13.)  The Court concludes that Plaintiff has not shown by clear and convincing evidence that Defendant's conduct related to its position on negligence was unreasonable and that Defendant knew or recklessly disregarded its lack of a reasonable basis for its handling of the issue.

The foundation of Plaintiff's argument on this issue is his assertion that Defendant "delayed a response to his counter demand and the scheduling of mediation because of the need to take a useless deposition."  (Doc. 48 at 12.)  While the record supports the conclusion that Haas further explored causation and liability during the litigation phase of the UIM claim (including the nature of the May 25, 2016, MVA), the record does not show delay because of "a useless deposition" or that any related conduct was unreasonable. "It is not bad faith for an insurer to take a stand with a reasonable basis or to 'aggressively investigate and protect its interests.'"  *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d at 523 (quoting *O'Donnell*, 734 A.2d at 906-10).

As previously discussed, Defendant had a reasonable basis to question causation and no evidence suggests that Defendant's response to Plaintiff's counter demand was unreasonable. Plaintiff made his counter demand of $250,000 prior to the start of oral discovery in October 2019. (*See* Doc. 49 ¶ 199.) Defendant's November 1, 2019, response to this demand included a response to Plaintiff's request for a stipulation of liability:

> Concerning your inquiry as to a stipulation of liability, the UIM carrier prefers to await completion of depositions of the investigating police officer and Sara Katrenicz before making a final determination in this regard.
>
> As far as your settlement demand is concerned, the UIM carrier is continuing with its medical investigation and as such, is not in a position to engage in such negotiations at the present time.

(Pl.'s Ex. 6 at 1.)

Clearly, the reason given for not responding to Plaintiff's settlement demand is the continuing medical investigation. That further medical investigation was underway is supported by the fact that Defendant disclosed the reports of two medical experts in March 2020, one on March 30, 2020, and another on March 31, 2020. (Pl.'s Ex. 9.) Defendant's assertion that negotiation regarding the settlement demand was linked to medical investigation is supported by the fact that the Defendant countered Plaintiff's demand on April 15, 2020, two weeks after it received the expert reports.[8] (*See* Doc. 49 ¶ 200.)

---

[8] On April 15, 2020, Defendant made a counter-offer of $92,500 to Plaintiff's demand of $250,000. (Doc. 49 ¶ 199.) Plaintiff then reduced his demand to $230,000. (*Id.*)

Plaintiff does not point to any clear and convincing evidence that there was an unreasonable basis for Defendant to pursue further medical investigation. As discussed at length in the previous section of this Memorandum Opinion, claims representatives expressed consistent concerns about the mechanism of injury for Plaintiff's trigeminal neuralgia.  After its offer was rejected and before the suit was filed, Defendant had expressed its intent to seek additional medical records and it did so.  (Doc. 40 ¶¶ 101, 102.) Defendant also conducted its handling of the case (including scheduling of depositions and release of medical expert reports) in accord with this Court's Case Management Order. (*See* Doc. 14.)

The foregoing summary shows that Defendant did not act unreasonably or cause delay in choosing to depose Katrenicz and continue its medical investigation.  Plaintiff does not point to any clear and convincing evidence which would support a contrary conclusion. Therefore, Plaintiff's assertion that the delay caused by Katrenicz's deposition shows bad faith is not supported by the evidence of record.

## C. Delay Caused by Failure to Timely Develop a Causation Defense

Plaintiff contends that Defendant did not "invest significant time and effort to assemble a defense that the accident did not cause or aggravate Mr. Coleman's trigeminal neuralgia" until "after the bad faith offer was rejected" and "the sole purpose of this offer was to justify its initial low-ball offer of $72,500, not defend the UIM claim."  (Doc. 48 at 13.)

Plaintiff's assertion that Defendant delayed the UIM claim while collecting expert evidence to justify its offer hinges on the offer being "low-ball" and Plaintiff's previous assertion that Defendant valued the claim at $150,000 at the time the initial offer was made. (*See* Doc. 48 at 13-14.)  As discussed previously, Plaintiff has not shown that the $72,500 was a "low-ball" offer, that the claim was valued at $150,000 at the time the offer was made, or that the offer was made for an improper purpose.  Because the Court has found that these underpinnings of Plaintiff's argument are not supported by clear and convincing evidence, *see supra* pp. 28-36, they cannot support his current argument.  Further, as reviewed previously, the Claim Summary Report and Loethan's deposition indicated that Loethan expressed ongoing skepticism about Plaintiff's right-side trigeminal neuralgia based on medical records he had received and Haas was assigned the claim with evaluations expressing this uncertainty.  *See supra* pp. 28-33.  Thus, the offer was not based on speculation but on a lack of clear causation at the time the offer was made.  In these circumstances, Defendant's post-offer conduct is reasonably considered a continuation of the process begun before the offer was made rather than an attempt to justify a low-ball offer.

## D. Other Matters

In the final section of his opposition brief, Plaintiff points to what Defendant did not do in the pre-offer period and what it did after as evidence of bad faith, alleging that everything Defendant did after the initial $72,500 offer, it did to justify the offer rather than to

resolve the UIM claim and the only purpose of the post-suit UIM investigation was to protect Defendant from a bad faith verdict.  (Doc. 48 at 15-20.)  As the Court has previously discussed, Plaintiff's foundational premise of the "low-ball" offer is not supported by clear and convincing evidence nor are his allegations regarding the purpose of post-offer claims activity.

Turning to Plaintiff's specific refutation of Defendant's asserted grounds for the reasonableness of its evaluation and handling of Plaintiff's UIM claim, Plaintiff first contends that Defendant had ample time to address the red flags before they made an offer.  (Doc. 48 at 18.)  While this may or may not be true, assuming Defendant could have acted more quickly in resolving issues related to UIM coverage does not lead to a finding of bad faith. As discussed above, Defendant had a reasonable basis to continue its investigation after its initial offer was rejected.  The Court recognizes that bad faith may "'extend to the insurer's investigative practices,' [but] in the absence of evidence of a dishonest purpose or ill will, it is not bad faith for an insurer to take a stand with a reasonable basis or to 'aggressively investigate and protect its interests.'" *Post*, 691 F.3d at 523 (quoting *O'Donnell,* 34 A.2d at 906–10).  Plaintiff's speculation about what Defendant *could* have done pre-offer does is not evidence of a dishonest purpose or ill will.

Next, Plaintiff points to what he sees as the clarity of Dr. Malizia's report to refute Defendant's position that records related to trigeminal neuralgia were not clear.  (Doc. 48 at 17.)  As set out above, Loethen explained his analysis of the report and his basis for finding

it inconclusive as to causation.  The report is not so clear as to causation that, considered in

conjunction with other evidence of record (including June and July 2016 medical/dental

records), Loethen and Haas did not have a reasonable basis to conclude that the report

concerning the cause of trigeminal neuralgia did not alleviate uncertainty.  Again, Plaintiff

does not point to any evidence of a dishonest purpose or ill will in the claims

representatives' assessment of the report.

Plaintiff again identifies the claim valuation at the time of offer and the release

accompanying the offer letter as evidence of bad faith.  Having fully considered these issues

above and concluded they are not indicative of bad faith, further discussion is not

warranted.

The Court's conclusion that Plaintiff has not pointed to clear and convincing evidence

of bad faith pursuant to § 8371 is not a conclusion that Defendant's claims handling was

flawless or that Defendant could not have more expeditiously resolved questions related to

the identified "red flags" including numerous previous accidents, recently increased

coverage, and conflicting medical records.  However, as discussed above, the record

supports a finding that Defendant had consistent concerns with causation of injuries,

trigeminal neuralgia in particular, and worked toward resolving the UIM claim.  Importantly,

Plaintiff has not pointed to evidence that delay was attributable to "a bad motive or reckless

indifference to the interest of others."  *Polseli*, 23 F.3d at 751.  As to the latter, the Court

finds it significant that Defendant was continuing to pay for treatment related to Plaintiff's

trigeminal neuralgia throughout the period at issue so Plaintiff's interest in payment of treatment for injuries claimed was taken care of by the PIP payments.

## V. CONCLUSION

The foregoing discussion shows that Defendant is entitled to summary judgment on Plaintiff's bad faith claim brought pursuant to 42 Pa. C.S. § 8371 contained in Count II of his Complaint (Doc. 1-1 at 11). However, in Plaintiff's Answer to Defendant's Statement of Material Facts (Doc. 49), Plaintiff agrees with Defendant's statement regarding his 42 Pa. C.S. § 8371 bad faith claim in Count II but further states that "Count I of the Complaint also contained allegations in support of common law bad faith, and as such, is still viable." (Doc. 49 ¶ 1.) Because Defendant has not presented any argument regarding the disposition of Plaintiff's alleged common law bad faith claim contained in Count I of Plaintiff's Complaint and it would be improper for the Court to address the viability or disposition of this claim *sua sponte*, Plaintiff's alleged common law bad faith claim goes forward.[9] With this clarification, the Court will grant Defendant's Motion for Summary Judgment as it relates to statutory bad faith pursuant to 42 Pa. C.S. § 8371. A separate Order will be entered.

Robert D. Mariani
United States District Judge

---

[9] The standard for common law bad faith diverges from statutory bad faith, *Myers v. Geico Casualty Co.*, 837 F. App'x 906, 910 (3d Cir. 2020) (citing *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 236 (3d Cir. 2003)). With the determination that Plaintiff's alleged common law bad faith claim goes forward, the Court makes no assessment of the merits of such a claim.